UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PURETERRA NATURALS, INC. d/b/a
Calm Coat, KRISTEN WATTERS,
and JULIE NUGENT,

     Plaintiffs,

v.                       Case No. 8:09-cv-797-T-33MAP

CUT-HEAL ANIMAL CARE PRODUCTS,
INC.,

     Defendant.

_____/

JENNIFER ELLIOTT and LAST CHANCE
RANCH, INC.,

     Plaintiff-Intervenors,

v.

PURETERRA NATURALS, INC., KRISTEN
WATTERS, JULIE NUGENT, and CUT-HEAL
ANIMAL CARE PRODUCTS, INC.,

     Defendants-in-Intervention.

_____/

**<u>ORDER</u>**

     This matter comes before the Court pursuant to the filing
of two motions for summary judgment. Cut-Heal Animal Care
Products, Inc. filed a Motion for Summary Judgment (Doc. # 92)
on June 10, 2011. PureTerra Naturals, Inc., Kristen Watters,
and Julie Nugent filed a Response to the Motion on June 24,
2011. (Doc. # 97). Jennifer Elliott and Last Chance Ranch,
Inc. filed a Response to the Motion on July 1, 2011 (Doc. #

99) and also adopted by reference the arguments asserted in PureTerra, Watters, and Nugent's Response (Doc. # 97). (Doc. # 100, 102).

In addition, PureTerra filed a Motion for Partial Summary Judgment (Doc. # 93) on June 10, 2011. Elliott and Last Chance Ranch filed a Response on July 1, 2011. (Doc. # 98). For the reasons that follow, the Court denies the Motions for Summary Judgment.

## I.   Factual Background

This case involves both a patent infringement action and an indemnity action. Cut-Heal's Motion for Summary Judgment relates to the patent infringement action, and PureTerra's Motion for Partial Summary Judgment relates to the indemnity action.

### A.   The Invention

Elliott has a Bachelor's degree in Political Science and a Master's degree in International Economics. (Doc. # 97-1 at 9-10). She is also a Registered Nurse with training and "certifications" in aroma-therapy. Id. at 10, 12. She has a passion for horses and has rescued numerous "neglected and abused and starved" horses. Id. at 5.

In May, 1995, Elliott incorporated her horse ranch under the name "Last Chance Ranch, Inc." (Doc. # 97-2 at 11). Using

her nursing background and aroma-therapy training, she developed a product to treat skin infections common among horses. (Doc. # 97-1 at 13-14). Her product, known as "Calm Coat" involves a proprietary blend of essential oils, such as tea tree oil, lavender, and eucalyptus. (Doc. # 97-2 at 17). She remarks that Calm Coat works "astonishingly" well to cure horses' skin conditions. Id. at 22.

Elliott first sold Calm Coat (36 bottles) to Richey Brown at her local feed store, Burt Reynolds Ranch, on May 22, 1995, as evidenced by a May 22, 1995, check in the Court's file. (Doc. # 92-4 at 6; Doc. # 97-2 at 36). After her initial sale to Brown, she "tweaked" the formula by reducing the amount of tea tree oil. (Doc. # 97-2 at 18-20). After her sale to Brown, she provided a few bottles to her neighbors as samples. Id. at 25.[1]

She applied for a patent on May 13, 1996, and was issued United States Patent No. 5,620,695 (the '695 Patent) on April

---

[1] It should be noted that Elliott was deposed two times. She was deposed in her individual capacity on April 28, 2010. (Doc. # 97-1). During that deposition, she testified that she gave Calm Coat samples to her neighbors before her sale of the Calm Coat product to Brown. (Doc. # 97-1 at 14-15). In her second deposition on June 2, 2011, in her capacity as the corporate representative of Last Chance Ranch, Elliott testified that she gave Calm Coat samples to her neighbors only after her sale to Brown. (Doc. # 97-2 at 25).

15, 1997. (Doc. # 97-1 at 17-19).

**B.   The Agreement with McCready**

Elliott developed various relationships with manufacturers and distributors and then met John McCready in Kentucky at a Rolex equestrian event. (Doc. # 97-1 at 26). McCready admired Calm Coat and offered to go into business with Elliott.  Id.  McCready owns the company Cut-Heal Animal Care Products, Inc. (Doc. # 97-1 at 38).  According to Elliott, McCready

> approached me, and he said you have a wonderful
> product here, you have a certain selling base, I
> can really help you with this, and I can solve all
> the problems that you're having and going to have
> with federal regulations and labeling and stuff
> like that, and I can get into the big places that
> you can't get into, so we can work together and we
> won't be competitors.

Id. at 26.

Last Chance Ranch entered into a private label distribution agreement with McCready on June 28, 2000. (Doc. # 97-3).  Less than a year later, on October 27, 2000, Last Chance Ranch terminated the agreement with McCready because McCready was not making required payments "on time." (Doc. # 97-1 at 33).  In addition, according to Elliott, McCready manufactured its own version of Calm Coat in violation of her patent, passed the infringing product off to consumers as Calm

4

Coat, and sold the infringing product for less money than Last Chance Ranch would charge for Calm Coat. Id. at 37-38.

When Elliott saw infringing bottles of Calm Coat, she "went to [her] soon-to-be husband and we took all of his retirement out of the bank and we went to a really, really good attorney." (Doc. # 97-1 at 36). Elliott's attorney referred her to another attorney who sent a cease and desist letter to McCready. Id. Elliott assumed that "the lawyer handled everything. [She] thought it was a done deal." (Doc. # 97-2 at 45). It did not occur to Elliott that McCready would continue to sell Calm Coat or any infringing product after the termination of the distribution agreement. (Doc. # 97-1 at 45; 97-2 at 45). As stated by Elliott: "After the lawyers did their thing, Cut-Heal asked me for my product, and I was not selling him more product, so I assumed that after the attrition rate, he wouldn't be selling anymore." (Doc. # 97-2 at 45).

Elliott did not see any more bottles of the infringing product at her local feed store within six months of the cease and desist letter. Id. at 62. Elliott did not see any infringing products at any stores again until July 2011. Id. at 64. However, in February 2008, she learned that McCready was selling the infringing product over the internet. Id. at

68.

### C.   __The Asset Purchase Agreement with PureTerra__

On January 11, 2008, PureTerra entered into an Asset Purchase Agreement with Elliott and Last Chance Ranch. (Doc. # 54 at 2, ¶ 8). Pursuant to Section 1.1(c) of the Asset Purchase Agreement, Elliott and Last Chance Ranch sold, among other assets, the '695 Patent to PureTerra. Id. at 3, ¶ 9. The '695 Patent was the primary asset transferred under the Asset Purchase Agreement. (Doc. # 58 at 4, ¶ 6). PureTerra paid $500,000.00 for the '695 Patent and agreed to pay Elliott royalties at the rate of 10% of product sales. (Doc. # 54-1 at 7; Doc. # 49 at 2).

In Section 5.1 of the Asset Purchase Agreement, Elliott and Last Chance Ranch indemnified PureTerra with respect to representations Elliott and Last Chance Ranch made to PureTerra regarding the '695 Patent. (Doc. # 54 at 3, ¶ 10). One of those representations was that Elliott and Last Chance Ranch had good, valid, and marketable title to the '695 Patent. Id.

The relevant indemnification provision follows:

> Seller Indemnification.  Seller hereby agrees to indemnify and hold harmless Buyer, its affiliates and its and their respective directors, officers, partners, members, managers, employees, and agents, against and in respect of all losses, liabilities,

obligations, damages, deficiencies, actions, suits, proceedings, demands, assessments, orders, judgments, costs and expenses (including the reasonable fees, disbursements and expenses of attorneys and consultants) of any kind or nature whatsoever, but net of the proceeds from any insurance policies or other third party reimbursement for such loss, to the extent sustained, suffered or incurred by or made against any indemnified party, to the extent based upon, arising out of or in connection with: (a) any breach of any representation or warranty made by Seller in this Agreement or in any schedule, exhibit, certificate, agreement or other instrument delivered pursuant to this Agreement; (b) any breach of any covenant or agreement made by Seller in this Agreement or in any schedule, exhibit, certificate, financial statement, agreement or other instrument delivered pursuant to this Agreement; (c) any claim made by any person or entity which relates to the operation of the Assets or the Business which arises in connection with or on the basis of events, acts, omissions, conditions or any other state of facts occurring on or existing before the date hereof; and (d) any claim which arises in connection with any liability or obligation of Seller other than the Assumed Liabilities.

(Doc. # 49-1 at 13-14, ¶ 5.1).

## II.  **Procedural History**

On April 28, 2009, PureTerra, Watters and Nugent initiated a patent infringement action by filing a lawsuit against Cut-Heal for infringement of the '695 Patent. (Doc. # 1).[2]  In its answer to the complaint, Cut-Heal asserted

---

[2] Both Watters and Nugent are directors of PureTerra. (Doc. # 1 at 2, ¶ 6-7).

7

eight affirmative defenses, many of which challenged the validity of the '695 Patent. (Doc. # 26 at 4-5; Doc. # 58 at 6).

On November 12, 2010, Elliott and Last Chance Ranch filed a motion to intervene asserting that they had "numerous interests in the ['695] Patent" and that without their involvement, their interests would not be "adequately represented by [the] existing parties." (Doc. # 49 at 3-4). These interests included, among other things, a contractual duty to indemnify PureTerra if the '695 Patent is found invalid, a security interest in the '695 Patent, a right to foreclose on the '695 Patent in the event PureTerra defaults on its payments, and a contractual right to receive royalty payments from PureTerra. Id.

In the motion to intervene, Elliott and Last Chance Ranch emphasized their "contractual duty to indemnify PureTerra in the event the ['695] Patent is held to be invalid." (Id. at 4; Doc. # 54 at 4-5). In arguing that their interests were "not adequately represented by existing parties," Elliott and Last Chance Ranch asserted that "[t]his is especially true with respect to [Elliott and Last Chance Ranch's] contractual duty to indemnify PureTerra in the event the ['695] Patent is held to be invalid" because PureTerra "may attempt to hold

8

[Elliott and Last Chance Ranch] liable if the ['695] Patent is determined to be invalid, and [Elliott and Last Chance Ranch], as indemnitors, must protect themselves and their potential liability . . . ."  (Doc. # 49 at 4).  On December 2, 2010, the Court granted the motion to intervene.  (Doc. # 53).

On December 6, 2010, Elliott and Last Chance Ranch filed an intervenor complaint against PureTerra and Cut-Heal, seeking a declaratory judgment regarding the validity of the '695 Patent.  (Doc. # 54).  In its answer to the intervenor complaint, PureTerra asserted one counterclaim against Elliott and Last Chance Ranch seeking indemnity for patent litigation. (Doc. # 58 at 7).  PureTerra alleged that Elliott and Last Chance Ranch possessed knowledge of, but failed to disclose, "the facts and circumstances that allegedly give rise to Cut-Heal's affirmative defenses attacking the validity of the '695 Patent" at the time the Asset Purchase Agreement was signed.  Id. at 6.

PureTerra further contended that "[e]ven though Ms. Elliott and Last Chance Ranch allege in their Complaint for Intervention that the [Asset] Purchase Agreement requires them to indemnify PureTerra, Ms. Elliott and Last Chance Ranch have refused PureTerra's demands for indemnification."  Id. at 6.

9

PureTerra filed a Motion for Summary Judgment as to liability only seeking a ruling that Elliott and Last Chance Ranch are required to indemnify PureTerra pursuant to the Asset Purchase Agreement. Also before the Court is Cut-Heal's Motion for Summary Judgment in which it seeks a ruling that the '695 Patent is invalid.

## III. **Legal Standard**

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray,

461 F.3d 1315, 1320 (11th Cir. 2006). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id.

**IV.  Analysis**

    **A.  Indemnity Motion for Summary Judgment**

PureTerra contends that it is entitled to summary judgment on the issue of whether Elliott and Last Chance Ranch must indemnify PureTerra under the Asset Purchase Agreement. As noted, the Asset Purchase Agreement contains a lengthy "Seller Indemnification" provision.

However, in its Motion for Summary Judgment, PureTerra does not enumerate any specific category of "losses, liabilities, obligations, damages, deficiencies, actions, suits, proceedings, demands, assessments, orders, judgments, costs and expenses (including the reasonable fees, disbursements and expenses of attorneys and consultants)" for which it seeks indemnification from Elliott and Last Chance

Ranch.  The Motion is silent when it comes to any amounts due and owing, or amounts so far expended, for which it may seek indemnification.

In the motion to intervene, Elliott and Last Chance Ranch admitted their "contractual duty to indemnify PureTerra in the event the ['695] Patent is held to be invalid." (Doc. # 54 at 4-5).  Because it appears that Elliott and Last Chance Ranch agree that they have a duty to indemnify PureTerra in the instance that the '695 Patent is invalidated, the Court surmises that PureTerra seeks a more comprehensive level of indemnification.

Without reference to their prior concession that they owe a duty of indemnification to PureTerra, Elliott and Last Chance Ranch assert that summary judgment on the issue of indemnity is inappropriate because Elliott and Last Chance Ranch have asserted the affirmative defenses of waiver, estoppel, and in pari dilecto.  However, with respect to these defenses, Elliott and Last Chance Ranch have not supplied the Court with any evidence or argument.

Under the doctrine of in pari dilecto "a plaintiff who participated in a wrongdoing may not recover damages resulting from the wrongdoing." Austin Bldg. Co. v. Rago, Ltd., 63 So. 3d 31, 35 n.2 (Fla. 3d DCA 2011).  Elliott and Last Chance

Ranch have not come forward with an iota of evidence, or even a suggestion, concerning a "wrongdoing" in which PureTerra (or its board members) may have participated.

Elliott and Last Chance Ranch's waiver and estoppel affirmative defenses fare no better. Elliott and Last Chance Ranch have not demonstrated any waiver by PureTerra nor have they provided the Court with any estoppel evidence or cogent arguments. Pleading affirmative defenses is one thing, proving them is another. Elliott and Last Chance Ranch have not come forward with any evidence to support the asserted affirmative defenses.

Nevertheless, this Court denies the vague and nebulous Motion for Partial Summary Judgment. This Court is not willing to make a blanket finding that Elliott and Last Chance Ranch are required to indemnify PureTerra without a further discussion of the items of damages or costs for which PureTerra seeks indemnification from Elliott and Last Chance Ranch. An order simply finding that Elliott and Last Chance Ranch are required to indemnify PureTerra, without enumerating the subject of the indemnification, would be overly broad and inappropriate, and it would not advance this case toward any final resolution because Elliott and Last Chance Ranch have admitted their indemnity obligation. Accordingly, the Court

denies the Motion for Partial Summary Judgment.

**B.   Patent Infringement Motion for Summary Judgment**

PureTerra sued Cut-Heal for patent infringement on April

28, 2009, alleging that Cut-Heal

> [I]s directly infringing one or more claims of the
> '695 Patent by manufacturing, distributing,
> offering to sell, and/or selling, without authority
> or consent from Plaintiff, products comprised of or
> incorporating the method and composition of a
> topical skin lotion that are covered by one or more
> claims of the '695 Patent, which have been
> marketed, by way of illustration and not
> limitation, under the name "Derma.Calm™" (the
> "Infringing Products").

(Doc. # 1 at ¶ 15).   In response to the patent infringement

allegations, Cut-Heal asserted various affirmative defenses

calling into question the validity and enforceability of the

'695 patent.   Cut-Heal's Motion for Summary Judgment focuses

on its fifth and eighth affirmative defenses.   In its fifth

affirmative defense, Cut-Heal asserts that the doctrine of

laches bars any relief against it.   Cut-Heal also asserts, in

its eighth affirmative defense, that the patent is invalid

because the invention, Calm Coat, was on sale for more than

one year prior to the date of the patent application.   The

Court will address these issues below.

14

1.   <u>Laches</u>

Cut-Heal has invoked the equitable defense of laches to the patent infringement action.   To prove its affirmative defense of laches, Cut-Heal must show that "(1) the plaintiff delayed for an unreasonable and inexcusable amount of time in filing suit, and (2) that the defendant was prejudiced as a result of the delay." <u>Vita-Mix Corp. v. Basic Holding, Inc.</u>, 581 F.3d 1317, 1333 (Fed. Cir. 2009).

"A rebuttable presumption of laches" arises when a patentee has delayed for more than six years after actual or constructive knowledge of the defendant's alleged infringing activity. <u>Id.</u>; <u>see</u> <u>also</u> 35 U.S.C. § 286 ("no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.") "At all times, the defendant bears the ultimate burden of persuasion of the affirmative defense of laches. . . . The burden of persuasion does not shift by reason of the patentee's six-year delay." <u>A.C. Aukerman Co. v. R.L. Chaides Constr. Co.</u>, 960 F.2d 1020, 1038 (Fed. Cir. 1992). A plaintiff may "burst a presumption of laches with the introduction of evidence sufficient to raise a genuine issue as to either delay or prejudice." <u>Hamstreet v. Banctec</u>, Case No. 91-1089, 1992 U.S. App. LEXIS 19150, at *3

15

(Fed. Cir. 1992).

Cut-Heal argues in its Motion for Summary Judgment: "It was inequitable for [Elliott] to sleep on [her] rights, when Elliott knew or should have known that Cut-Heal was continuing to manufacture and distribute Derma.Calm.  Elliott's failure to actively protect her patent led Cut-Heal to continue manufacturing Derma.Calm in the belief that there was no patent, that there was no infringement, and that any patent rights were not going to be pursued." (Doc. # 92 at 12). Cut-Heal also notes that "Elliott and Last Chance Ranch stood by, doing nothing to protect their rights for over nine years, while Cut-Heal was building a business, which it thought was legitimate." Id.[3]

In Ultimax Cement Manufacturing Corp. v. CTS Manufacturing Corp., 587 F.3d 1339, 1348 (Fed. Cir. 2009), the patentee waited 12 years to file a patent infringement action, and, therefore, the trial court granted summary judgment in

---

[3] It should be noted that it was PureTerra and the directors of PureTerra (Watters and Nugent), and not Elliott, that initiated this action for patent infringement against Cut-Heal.  The record reflects that PureTerra purchased the patent on January 11, 2008, and discovered the alleged infringement in February, 2008.  PureTerra filed suit against Cut-Heal on April 28, 2009.  Therefore, the presumption of laches and the application of laches principles would not be appropriate as to PureTerra, Watters, and Nugent.

favor of the defendant based on a finding of laches. The trial court reasoned that the patentee should have known of the defendant's infringement, at least in part, due to the history between the parties. Specifically, the parties worked together on cement mixtures and then had a "falling out." The Federal Circuit reversed the trial court's laches determination because there was a genuine issue of material fact as to when the patentee had actual or constructive knowledge of the infringement.

To the extent that the defense of laches has been asserted against Elliott, this Court determines that there is a genuine issue of material fact as to whether Elliott unreasonably delayed prosecution of her patent rights. As in Ultimax, Elliott entered into an agreement with Cut-Heal but had a falling out with McCready. Elliott terminated her agreement with Cut-Heal shortly thereafter. Within one year of the termination of her agreement with Cut-Heal, Elliott hired an attorney who sent Cut-Heal a cease and desist letter.[4]

Elliott testified that shortly after her attorney sent various communications to Cut-Heal, she no longer saw any

---

[4] However, a copy of that letter is not within the Court's file.

17

bottles of the infringing product at any stores; however, she did not conduct a vigorous investigation of whether the infringing product was on the shelves.  It did not occur to her that Cut-Heal would keep producing her Calm Coat product after she terminated the agreement with Cut-Heal and after her attorney advised Cut-Heal of her patent rights.

Elliott did not see the infringing product for sale from 2001 until 2011, after her assignment of her patent rights to PureTerra via the January 11, 2008, Asset Purchase Agreement. (Doc. # 97-2 at 59-65).  However, she learned in 2008, through PureTerra, that Cut-Heal was selling Derma.Calm, the allegedly infringing product, via a website.  (Doc. # 97-1 at 38, 45). Thus, there is a genuine issue of material fact as to when Elliott knew, or should have known, that Cut-Heal was selling an infringing version of her product after the termination of the distribution agreement.

When she first noticed the infringing product between 2000 and 2001, she worked with an attorney to stop the alleged infringement.  Thereafter, she did not see or learn of any possible infringement until 2008.  This suit was filed on April 28, 2009, and Elliott and Last Chance Ranch intervened in the action on December 6, 2010. (Doc. ## 1, 54). The Court would therefore be hard pressed to justify a finding of

"unreasonable and inexcusable" delay.  The record does not contain clear evidence that a period of six years elapsed between Elliott's notice of infringement and the filing of this action.  Therefore, the presumption of unreasonableness does not attach in this case.

In addition, other than the vague statement that Cut-Heal has continued to build its business for nine years, Cut-Heal has not come forward with any evidence or persuasive arguments to demonstrate material prejudice, the second required element for proving laches.  As explained in <u>Serdarevic v. Advanced Medical Optics, Inc.</u>, 532 F.3d 1352, 1360 (Fed. Cir. 2008):

> Material prejudice . . . may be either economic or evidentiary.  Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts. . . . Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit.

<u>Id.</u> (citing <u>Aukerman</u>, 960 F.2d at 1033).

If the Court had determined that six years elapsed prior to prosecution of the patent rights at stake, the laches presumption would excuse Cut-Heal from demonstrating any prejudice.  <u>See</u> <u>Serdarevic</u>, 532 F.3d at 1359 ("Once the presumption of laches has attached, the defendants could have

remained utterly mute on the issue of prejudice and nonetheless prevailed.") However, the presumption of laches has not attached in this case. Therefore, Cut-Heal was required to provide this Court with some evidence of prejudice to meet its burden of showing material prejudice. It has not done so. Accordingly, the Court denies Cut-Heal's Motion for Summary Judgment to the extent it is based upon the defense of laches.

### 2.   **Sale Bar Date**

Cut-Heal asserts that the '695 patent is invalid because Elliott's invention (Calm Coat) was on sale for more than one year prior to the date of the patent application. Pursuant to 35 U.S.C. § 102(b), "a person shall be entitled to a patent unless . . . The invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." In Gould, Inc. v. United States, 579 F.2d 571, 580 (Fed. Cl. 1978), the court analyzes this statute and explains:

> It appears certain that the purpose of the on sale bar and the 1-year grace period is an attempt by Congress to balance the interests of the inventor with the interests of the public. On the one hand, Congress was concerned that an inventor would have sufficient time to not only determine whether a patent is desired following a sale, but that sufficient time would also be provided to have the patent application prepared and filed in the Patent

Office.  On the other hand, Congress was concerned with encouraging inventors to file for a patent as soon as possible and, at the same time, prevent commercial exploitation of an invention as a trade secret for one than one year.

Id.

Elliott applied for her patent on May 13, 1996. Therefore, if Cut-Heal can demonstrate that Elliott was selling Calm Coat outside of the one year grace period prior to her patent application, the Court should invalidate Elliott's patent.  The record contains a check dated May 22, 1995, evidencing Elliott's first sale of Calm Coat. (Doc. # 92-4).  Elliott's sale falls squarely within the one year grace period.

Cut-Heal has attempted to tack ten extra days on the front end of Elliott's May 22, 1995, sale of Calm Coat to Brown, in an effort to expel Elliott's initial sale from the one year grace period.  Elliott testified that she brought Calm Coat to Brown on May 22, 1995, hoping that Brown would consider taking the products and selling them on consignment. (Doc. # 97-2 at 31).  Rather than selling on consignment, Elliott indicates that Brown accepted the Calm Coat on the spot and wrote her a check for the product that very day. Id.

Cut-Heal has filed in conjunction with its Motion for Summary Judgment the November 12, 2010, affidavit of Brown.

(Doc. # 92-4).  Therein, in contorted and strained statements, Brown insinuates that Calm Coat may have been on sale ten days prior to his May 22, 1995 purchase.   In this affidavit, he states: "Due to liability concerns, B.R. Ranch Feed Store would routinely evaluate a product, such as Calmcoat for a period of more than ten (10) days before offering the product to its retail customers." Id. at ¶ 10.  He further indicates his "belief that Jennifer Elliott and/or Last Chance Ranch were distributing and selling the Calmcoat product for more than 10 days prior to the time B.R. Ranch Feed Store took delivery of the Calmcoat product, and wrote check number 6686 to Last Chance Ranch." Id. at ¶ 15.

Elliott and PureTerra strike several devastating blows at Brown's November 12, 2010, affidavit.[5]  They correctly argue that the Brown affidavit was wrongfully withheld during discovery as a privileged work product document (which it certainly is not), they argue that the affidavit is not based on personal knowledge, and they have come forward with a competing and clarifying declaration of Brown, dated June 30, 2011. (Doc. # 99-1).

---

[5] Elliott and Last Chance Ranch adopted PureTerra's response to Cut-Heal's Motion for Summary Judgment. (Doc. # 102).

Brown's June 30, 2011, declaration contains some revealing statements:

> I previously executed an affidavit about this lawsuit on November 12, 2010. Prior to that date, I was contacted by an attorney who asked me to sign an affidavit regarding a check I signed and the sale of Calmcoat by Jennifer Elliott. I told the attorney that I did not have a clear memory of the events surrounding the check to Mrs. Elliott which was dated May 22, 1995. **The attorney told me that if I did not sign the affidavit, I would be required to go to a deposition and travel a long distance.** The attorney faxed me more than one version of an affidavit that said I knew the exact date when Mrs. Elliott began selling and distributing Calmcoat. I told the attorney that I could not sign these affidavits because I could not clearly remember the sequence of events from fifteen years ago. . . . **I do not have a clear recollection of whether Mrs. Elliott sold or distributed Calmcoat to any other people prior to the date of the check.**

(Doc. # 99-1 at ¶¶ 2-5)(emphasis added).

This Court would be justified in striking Brown's November 12, 2010, affidavit as a sanction for improperly classifying and withholding such affidavit as privileged, when in fact, there is no basis for such classification. However, it is not necessary to do so. The Court would be remiss to invalidate the '695 Patent based on Brown's speculative, compromised, and contradicted affidavit.

Cut-Heal, without providing any supporting argumentation, also points to Elliott's recanted testimony that she gave some

23

samples of Calm Coat to her neighbors before selling her product to Brown.   During her second deposition, Elliott stated that she checked her records and realized that she mis-spoke during her initial deposition.   She clarified that she gave the samples away after her sale to Brown (during the one year grace period): "I went back and checked my records and when I gave bottles to people to try.   It was specifically to get a testimonial.   And that was after I sold to Richey Brown." (Doc. # 97-2 at 25).   Elliott's recanted testimony is relevant to the sale bar date, but lacks the specificity and corroboration necessary for this Court to invalidate the '695 Patent.   Cut-Heal has not provided the Court with the date upon which the offering of samples allegedly took place or any proof, other than recanted and clarified testimony, to support its position.[6]   Evaluating the evidence in the light most favorable to the non-movants, the Court denies the Motion for Summary Judgment to the extent that it is based upon an alleged violation of the sale-bar rule.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Cut-Heal Animal Care Products, Inc.'s Motion for Summary

---

[6] In addition, Elliott testified that, after her initial sale of Calm Coat to Brown, she changed the Calm Coat formula.

Judgment (Doc. # 92) is **DENIED.**

(2)   PureTerra Naturals, Inc.'s Motion for Partial Summary

Judgment (Doc. # 93) is **DENIED.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>5th</u>

day of October, 2011.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel and Parties of Record

25